CARLOTTA SHEHY, Adm'x of the Estate of Deborah Shehy, Deceased, Plaintiff-Appellee, *v.* FRANK BOBER *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 78-1440

Opinion filed November 20, 1979.

Claussen, Miller, Gorman, Caffrey & Witous, P. C., of Chicago (James T. Ferrini, of counsel, on appeal), for appellants.

William D. Maddux & Associates, of Chicago (Philip J. Rock and William P. Jones, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

In a wrongful death action plaintiff Carlotta Shehy, on behalf of herself and her minor son Anthony, sought to recover from defendants Frank and Irene Bober damages resulting from an accident in which her four-year-old daughter Deborah sustained fatal injuries in a fall from a window of their third-floor apartment located in a building owned by defendants. The trial court entered judgment upon a jury trial verdict of $150,000 and denied defendants' post-trial motions for judgment *n.o.v.* or, among other relief alternatively sought, a new trial upon all issues. Defendants appeal from the judgment order and the order denying the post-trial relief named, raising, *inter alia*, the sufficiency of the underlying complaint.

For the reasons hereinafter stated, we reverse the judgment orders of the circuit court and remand the cause for a new trial.

Plaintiff's initial complaint was filed on December 3, 1973, and as finally amended contained four counts. Count I was brought under the provisions of the Illinois Wrongful Death Act (Ill. Rev. Stat. 1971, ch. 70, pars. 1, 2) and alleged among other things that defendants "at the inception" of plaintiff's tenancy agreed to assume the ordinary upkeep, maintenance and repair of the apartment for its duration; at the time of the accident and for a considerable period prior thereto defendants had notice, knew or should have known that certain windowsills were rotten and falling apart, and that certain windows had no screens or other protective devices on them; defendants were under a duty to repair the premises and keep them in repair for the safety of tenants and children of tender years; on or about December 3, 1971, Deborah fell through a window at defendants' building, was precipitated three stories to the ground and consequently died, said occurrences being directly and proximately caused by dangerous and defective conditions and conduct ascribable to defendants' negligence, including failure to warn the

plaintiff of rotten windowsills and to repair rotten windowsills. Count II was a claim for funeral expenses incorporating the factual allegations of count I. Count III added an allegation of pain and suffering undergone by Deborah from the date of the accident until the date of her death. Count IV alleged that defendants "for valuable consideration" agreed to perform certain repairs to the windows and windowsills in her apartment. Sections 78—11 and 78—17.3 of the Chicago Housing Code were alleged to be in full force and effect at all relevant times, which defendants were claimed to have violated as a direct and proximate result of which the accident allegedly occurred. Defendants' answer consisted of general denials.

The case proceeded to trial on February 15, 1978. At the conclusion of the opening statements and prior to the presentation of evidence, the court allowed defendants' motion to dismiss count III of the complaint on the ground that available information confirmed and plaintiff's counsel in his opening statement had just admitted that Deborah had been unconscious from the time of the accident until death and, therefore, no conscious pain and suffering occurred. The court also ordered "* * * that the plaintiff be and is hereby prohibited, warned and admonished from making any reference to conscious pain and suffering * * *" for the duration of the trial.

Plaintiff called defendant Frank Bober (sometimes hereinafter "Bober") as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60), who testified that he bought the building located at 739 S. Kostner about April of 1971 from a Mrs. Jesse Herman. Existing apartment leases remained in effect after the purchase. He inspected the building prior to purchase, and was in plaintiff's apartment on three or four occasions prior to December 2, 1971. On the first occasion, he came to inspect it and on another to check the heat after plaintiff phoned him. He personally painted the window trim on the outside of the building. On the date of the accident, he was working in the basement when an unidentified person told him a little girl was playing on the window ledge. He went outside and found her beneath the window lying on the concrete and apparently bleeding. He then ran up to plaintiff's apartment, banged on the door, and receiving no answer, went down to the first floor to call the police. The girl's parents appeared after the police arrived. At this point in defendant's questioning by plaintiff's counsel the following exchange occurred regarding Deborah's condition after the fall and before she was removed:

"Q. Was she conscious?
A. Was she conscious? She was moving, she was breathing.
Q. Groaning?
A. She was moving, yes.

Q. Was she uttering any sound?

A. Not anything that you know, understandable, maybe just grunting something.

Q. Well, did she make the sound that she was obviously in pain?

A. I don't know. She made a sound, I really would not go into that much detail. I am not a professional on whether she was in pain.

Q. It was obvious that she was in pain?"

Defense counsel objected to the foregoing questions based upon the prior order prohibiting reference to conscious pain and suffering and on the opening statements of plaintiff's counsel. The court overruled the objection on the ground that it could not "* * * suppress the truth of a witness under oath." Counsel for plaintiff then asked defendant again if the girl was obviously in pain when he observed her on the ground and defendant responded affirmatively.

Defendant was then questioned extensively about his understandings and course of conduct relating to repair and maintenance of apartments generally and plaintiff's specifically. He understood it to be his responsibility to keep the walls, windows, doors and "permanent" parts of the building in good repair. While painting the outer window trim he was in a position to observe the two-part window latches on the inside. Apparently referring to the window from which Deborah fell, he found no rotten wood on the outside that needed replacing. Defendant also observed the latches on that window while he was painting. He did not think he would have had trouble getting permission to enter plaintiff's apartment to make a necessary repair. If he had observed that any window hardware was missing, he would have been interested in replacing it.

Defendant was aware of the city ordinance requiring an apartment owner to keep windows in a sound state of repair, including the window hardware, part of which were the latches. He did not replace any hardware on the windows in plaintiff's apartment, but he did check them and see latches on them. Defendant acknowledged having testified at a prior deposition that he never checked the latches before the baby fell.

Plaintiff then testified. She identified her Exhibit 13 as a copy of the lease applying to her apartment at 739 S. Kostner. Before she moved in she had an opportunity to examine the apartment's interior, including the windows on the side of the apartment facing Kostner, from one of which Deborah later fell. The condition of the window was "pretty bad," with rotten wood over the sill and no noticeable lock. Before signing the lease plaintiff went to the real estate office to ask them to fix the windows and they agreed. After she moved in, however, the windows were not fixed.

In April of 1971 plaintiff was informed she should pay rent

thenceforth to Bober. She discussed the windows with him on three occasions after he bought the building but he never fixed them. The only repair work done on the windows was the replacement of a pane broken in the middle window during a windstorm, to the right of which was the one from which Deborah fell. It was replaced from the inside of the apartment by defendant before Deborah's accident.

On December 2, 1971, sometime after 3:30 to 4 p.m., plaintiff and her son Anthony left the apartment to meet her husband, who had gone looking for Anthony when he had not returned from school at the usual hour. Deborah remained in the apartment alone, where she had been sleeping for 15 or 20 minutes before they left. They walked to the corner of the building toward Lexington and waited there for plaintiff's husband. After he had arrived and was talking to plaintiff and Anthony, defendant ran up and told her Deborah had fallen from the window. The window had been closed when she left the building, but when she returned it was just high enough for Deborah to have gotten through. Deborah remained in a coma until she died on December 8. Before the accident plaintiff had seen Deborah and Anthony playing around the windows on the side of the apartment facing Kostner and once had found them trying to let up the windows and look outside. Although she attempted to discipline them, plaintiff was unable to prevent the children from playing at the windows and therefore kept asking that they be fixed.

On cross-examination plaintiff testified that when the management failed to fix the window she tried to nail across the top part of the window, but the wood would not hold the nails. No other attempt was made to fix the window. She estimated she had been away from the apartment no longer than twenty minutes when she was told of Deborah's accident. She first said she frequently left Deborah alone in the apartment, later stating that she had never done so before the accident occurred. She had testified during a prior deposition that she frequently left Deborah in the apartment by herself, but indicated at the trial that she must have misunderstood this question.

Chicago Police Officer Robert Doelker, a homicide investigator, testified for plaintiff that he was routinely assigned to the accident at about 5:30 p.m. on December 2, 1971. About 1½ hours later he arrived at the apartment and investigated the windows. He identified plaintiff's Exhibits 4 and 6 as accurately portraying the condition of the window through which Deborah fell at that time, and said that "[o]ne of the pieces of hardware * * * was missing" from the window latch, the part normally attached to the upper half of the window. Asked whether "* * * the wood where the hardware should have been attached was in the same deteriorated condition as portrayed in Exhibits 4 and 6," Doelker answered over objection in the affirmative. On cross-examination

he indicated his determination that the wood was in a deteriorated condition was based solely on his visual perception that the paint was chipped and coming off, a condition that can occur without the wood itself being deteriorated. There was a chair near the window with about one to 1½ feet of distance between the top of the chair and the windowsill.

On his own behalf defendant testified that the picture comprising defendants' Exhibit 1 represented the condition of the window as of December 2, 1971. He scraped the window and painted its sash between the time of the accident and the time when the picture was taken. While painting the outside of the building in the fall of 1971, he observed that the window moved properly in its frame and the top of the lower sash was in good condition. He also saw the latches on the window at that time. He never received a complaint from plaintiff about the condition of the windows. Defendant made no repairs before the accident but did repair a window broken during a storm in January when plaintiff's husband notified him.

Willie Mays, a resident of the apartment building at the time of the accident, testified for the defense that he saw the window the child was supposed to have fallen from shortly after the occurrence. It was opened "a little" and a chair was in front of it. A distance of about three feet separated the windowsill from the floor.

■■ Defendants contend initially that they are entitled to judgment as a matter of law, relying upon the principle that a lessor generally is not liable for injuries on premises leased to and under the control of a tenant. (*Dapkunas v. Cagle* (1976), 42 Ill. App. 3d 644, 647, 356 N.E.2d 575; *Thorson v. Aronson* (1970), 122 Ill. App. 2d 156, 258 N.E.2d 33.) Plaintiff's response is that the evidence involves the judicially recognized exception to this rule, that because both the original lessor before the lease was signed, and later, defendant, undertook to repair the window from which Deborah fell, a duty to repair the premises is recognized. (*Looger v. Reynolds* (1975), 25 Ill. App. 3d 1042, 324 N.E.2d 238; *Thorson*, 122 Ill. App. 2d 156, 160; *Moldenhauer v. Krynski* (1965), 62 Ill. App. 2d 382, 210 N.E.2d 809.) Plaintiff's testimony, however, was that the promise by the original lessor occurred prior to the signing of the lease; any obligation to repair thus undertaken would be merged in the later instrument, which recited that the tenant agreed both that she was satisfied with the condition of the premises and that there were no promises concerning their physical condition "* * * except those specifically set forth in [the] lease." (*World Insurance Co. v. Smith* (1975), 28 Ill. App. 3d 1022, 1025, 329 N.E.2d 518.) The alleged promise by defendant was made after the lease was entered into and therefore required consideration beyond its signing, evidence of which is wholly absent from the record. *Ing v. Levy*

(1975), 26 Ill. App. 3d 889, 892, 326 N.E.2d 51; *Moldenhauer*, 62 Ill. App. 2d 382, 386.

Plaintiff correctly asserts that the evidence nonetheless supports a further exception to the general rule of lessor's nonliability sufficient to contravene its effect. Plaintiff had pleaded in count IV that the violation of ordinance section 78—17.3 by defendant was a proximate cause of the accident. The violation of an ordinance prescribing a duty for the protection and safety of persons or property may constitute negligence giving rise to a cause of action on behalf of one who suffers injury or damage as a result. (*Dapkunas*, 42 Ill. App. 3d 644, 647; *Mangan v. F. C. Pilgrim & Co.* (1975), 32 Ill. App. 3d 563, 569, 336 N.E.2d 374.) Section 78—17.3, then in effect, read in relevant part as follows:

"Every window, exterior door, and basement hatchway shall be substantially tight, and shall be kept in sound condition and repair.

(a) Every window shall be fully supplied with window panes which are without open cracks or holes.

(b) Every window sash shall be in good condition and fit reasonably tight within its frame.

(c) Every window, other than a fixed window, shall be capable of being easily opened and shall be held in position by window hardware."

Defendants deny the applicability of the ordinance generally and in particular, claiming that the term "window hardware" as it appears therein does not include a metal latch by which a window is locked shut. ■■■ Defendants correctly maintain that the interpretation of a statute is generally a question of law for the court (*Burke v. Illinois Power Co.* (1978), 57 Ill. App. 3d 498, 373 N.E.2d 1354); however, in personal injury cases where liability is grounded in a statutory or ordinance violation, questions of whether a plaintiff comes within the class of persons intended to be protected by the statute or ordinance and whether the injury is of the kind generally intended to be prevented have been dealt with in terms of proximate cause and, as such, are subject to the determinations of the triers of fact. (*Felty v. New Berlin Transit, Inc.* (1978), 71 Ill. 2d 126, 130, 374 N.E.2d 203; *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 84, 117 N.E.2d 74; *Mangan*, 32 Ill. App. 3d 563, 569-72.) In *Mangan*, the plaintiff became frightened and fell when she opened the door of the oven in her apartment and a mouse jumped out. Suing the owner of the apartment building for damages resulting from the fall, she relied on, *inter alia*, a local ordinance prohibiting rodent infestation. On these facts the court found that the jury was presented with sufficient evidence to make a determination that the alleged ordinance violation proximately caused the injury. (32 Ill. App. 3d 563, 572.) Similarly in the present case, the

evidence adduced was sufficient to authorize the jury to determine that plaintiff's decedent was within purview of the ordinance (*Dini v. Naiditch* (1960), 20 Ill. 2d 406, 418-21, 170 N.E.2d 881), and that the harm which befell Deborah was intended to be prevented by the presence of such "window hardware" as a latch. See, *e.g., Jones v. Chicago Housing Authority* (1978), 59 Ill. App. 3d 138, 140-41, 376 N.E.2d 26.

Defendants alternatively claim that a new trial is required as a result of the combined effect of errors of the trial court and misconduct of plaintiff's counsel. Among a plethora of alleged errors and instances of misconduct we deem it necessary to discuss two in detail: the violation of the court's order prohibiting reference to conscious pain and suffering and the contradictory instructions given to the jury.

Defendants aver that the violation of the order *in limine* prohibiting any reference to conscious pain and suffering had a potentially serious prejudicial effect. Plaintiff counters that the trial court effectively vacated its earlier order when it discovered that, contrary to prior representations of counsel for both sides, Deborah apparently was conscious when Bober found her after the fall from the window. Nothing in the court's remarks can fairly be construed as vacating the earlier order. Rather, the court seemed to indicate in response to defense counsel's objection to Bober's testimony regarding Deborah's pain and suffering that it was unsolicited by the questions of plaintiff's counsel and therefore unobjectionable. The record, however, reveals that his testimony was given in direct response to leading questions. Assuming *arguendo* the trial court did properly vacate that part of the order concerning reference to conscious pain and suffering, the same order struck and dismissed count III of the complaint, the only portion alleging pain and suffering, which plaintiff has at no time moved to reinstate. An issue cannot be sustained by evidence absent a corresponding pleading (*Burke v. Burke* (1957), 12 Ill. 2d 483, 487, 147 N.E.2d 373; *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 137, 213 N.E.2d 89). Significantly, that part of defendants' Instruction No. 15 which included a direction that the jury could not consider the decedent's pain and suffering in assessing pecuniary injuries was given without objection by plaintiff. These circumstances rebut plaintiff's claim that the order *in limine* was at any point properly vacated. Where the likelihood for prejudicial effect is great, the violation of a trial court's order entered pursuant to a motion *in limine* excluding certain testimony or statements is reversible error. *Coleman v. Williams* (1976), 42 Ill. App. 3d 612, 617, 356 N.E.2d 394; see also *Clarquist v. Kirschenman* (1977), 55 Ill. App. 3d 76, 79, 370 N.E.2d 840.

The potential for prejudice was heightened by the contradictory instructions given to the jury as to whether there was a presumption of substantial pecuniary loss by the decedent's brother Anthony, a collateral

heir. Plaintiff's sole argument here,[1] that defendants have waived this issue on appeal by failing to object to plaintiff's Instruction No. 12 at any point during the trial, is not supported by the record. Defense counsel challenged that instruction with his own No. 14, which explicitly denied the presumption as to Deborah's brother, and counsel for plaintiff conceded the point. Nevertheless, through an apparent misunderstanding, the trial court read both instructions to the jury. After this occurred defense counsel attempted to bring the error to the court's attention. Under these facts we do not regard the issue as waived for purposes of our substantive consideration, to which we now proceed.

During the conference on instructions defense counsel initially indicated he had no objection to plaintiff's Instruction No. 12, identified as Illinois Pattern Jury Instructions, Civil, No. 31.01 (2d ed. 1971) (hereinafter cited as IPI Civil), which provided in relevant part that "[t]he law recognizes a presumption that the mother and brother have sustained some substantial pecuniary loss by reason of the death." Subsequently and before the conference was concluded, defense counsel indicated "[w]e are still arguing * * *" about whether that instruction or defendants' No. 14, identified as IPI Civil No. 31.03, was the correct statement of applicable law, the latter instruction providing in pertinent part that "[w]here a decedent leaves a mother the law recognizes a presumption that she has sustained some substantial pecuniary loss by reason of the death. There is no presumption of pecuniary loss to a brother of the decedent." Counsel for plaintiff withdrew his objection to defendants' No. 14 being given and the court in apparent agreement remarked, "There is no presumption of pecuniary loss to the brother of a decedent." Defense counsel then indicated his No. 14 was given. Notwithstanding the foregoing the court read both plaintiff's Instruction No. 12 and defendants' Instruction No. 14 to the jury. Shortly thereafter defense counsel approached the bench and pointed out that "* * * Plaintiff's Instruction Number 12 which he withdrew and which I substituted Defendants' Number 14 for was read when it should not have been * * *." The court responded, "Didn't I pull it out yesterday?" When defense counsel attempted to elaborate, counsel for plaintiff interjected, "That wasn't read. What was read, the one including the life table which you didn't object to. There was no discussion about it." Court and counsel then engaged in a discussion of a separate matter. Through apparent confusion, the question originally raised by defense counsel as to the foregoing instruction was never ruled on.

■■ The cases cited by plaintiff in this regard are inapposite because they

---

[1] Plaintiff does not contest defendants' assertion that the applicable law is correctly stated by their No. 14 instruction rather than by plaintiff's No. 12. See *Dodson v. Richter* (1962), 34 Ill. App. 2d 22, 180 N.E.2d 505.

deal with instructions which overlap excessively or lack an evidentiary basis rather than contradict each other. (*Dean v. Keith's & Ralph's Tavern, Inc.* (1975), 25 Ill. App. 3d 970, 324 N.E.2d 7; *Russo v. Kellogg* (1962), 37 Ill. App. 2d 336, 185 N.E.2d 377; *Onderisin v. Elgin, Joliet & Eastern Ry. Co.* (1959), 20 Ill. App. 2d 73, 155 N.E.2d 338.) Where contradiction rather than overlapping occurs, jury confusion as to the applicable law is virtually inevitable. The supreme court stated in *Bald v. Nuernberger* (1915), 267 Ill. 616, 620-21, 108 N.E. 724:

> "Counsel for appellee practically concede that the above instruction, taken by itself, incorrectly states the law, but they argue that it could have done no harm because the instructions must be taken as a series and several of those given for appellants stated the law correctly. This court has frequently held that instructions may supplement each other, but each one must state the law correctly as far as it goes, and they should be in harmony, so that the jury will not be misled. The jury are not able to select from contradictory instructions one which correctly states the law. (*Illinois Iron and Metal Co. v. Weber*, 196 Ill. 526; *Ratner v. Chicago City Railway Co.* 233 id. 169; *People v. Lee*, 248 id. 64; *People v. Novick*, 265 id. 436.) This instruction stated the law incorrectly, and even though there may have been correct instructions it is impossible to tell which ones the jury followed. An instruction no more harmful than this was held reversible error on a very similar question in *Rich v. Naffziger*, 248 Ill. 455."

(*Accord, Pappas v. Peoples Gas Light & Coke Co.* (1953), 350 Ill. App. 541, 549, 113 N.E.2d 585.) In the case at bar the court read the erroneous instruction penultimately and concluded the substantive reading of the applicable law with plaintiff's Instruction No. 13, which detailed the factors to be considered in determining the measure of damages which repeated explicit reference to "the mother and brother," thus reinforcing the impression that both parties were entitled to a presumption of substantial pecuniary loss. These circumstances, counsel for plaintiff's repeated references in closing argument to the "substantial loss * * * when a brother loses his sister" and the amount of the verdict returned require us to find that the giving of the two instructions constituted reversible error.

Although the errors hereinabove discussed relate directly to the question of damages rather than liability, defendants' other averments of error and misconduct of plaintiff's counsel, many of which bear upon the factual questions determinative of liability, require attention. These include extensive interrogation of Bober by him as to the construction of terms in the lease and the ordinance; his comments during trial and in closing argument misstating plaintiff's and defendants' respective

obligations at common law, under the lease and according to the ordinance; his repetition of Bober's apparently unsolicited reference to "the insurance company" during cross-examination; his leading question of Officer Doelker as to the "deteriorated condition" of the window from which Deborah fell; his comment in closing argument that defendants had not undertaken to repair the broken window latch in the years since the occurrence; the court's refusal, based upon the requirements of the Illinois Dead Man's Act (Ill. Rev. Stat. 1977, ch. 51, par. 2), to allow defense counsel to question Irene Bober as to her reception of plaintiff's complaints about the broken latch; the misstatements of the law by the court during trial. Many of the incidents in question occurred without objection; defendants nevertheless argue that in the aggregate they denied defendants a fair trial, affected substantial rights and did not require preservation for purposes of appeal. *Belfield v. Coop* (1956), 8 Ill. 2d 293, 134 N.E.2d 249; *Paulsen v. Gateway Transportation Co.* (1969), 114 Ill. App. 2d 241, 252 N.E.2d 406; *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 381 N.E.2d 383. ■■ Where, as here, the question of liability is sufficiently close so that a verdict might reasonably have been returned for either party, it is essential that the trial be so conducted that the jury will not be improperly influenced; otherwise, reversal is required. (*Mattice v. Klawans* (1924), 312 Ill. 299, 304, 143 N.E. 866, *cert. denied* (1926), 271 U.S. 685, 70 L. Ed. 1151, 46 S. Ct. 637; *Ryan v. McEvoy* (1974), 20 Ill. App. 3d 562, 565, 315 N.E.2d 38.) When, as in this case, it cannot be determined from a review of the record whether the combined effect of misconduct and evidentiary errors misled the jury and affected its verdict, the sole remedy is to grant a new trial. (*Underwood v. Pennsylvania R.R. Co.* (1966), 34 Ill. 2d 367, 371, 215 N.E.2d 236; *Mattice*, 312 Ill. 299, 310; *Geisberger v. Quincy* (1972), 3 Ill. App. 3d 437, 442, 278 N.E.2d 404; *Mack v. Davis* (1966), 76 Ill. App. 2d 88, 98, 221 N.E.2d 121.) Our examination of the entire record in light of the foregoing principles compels us to conclude that a new trial as to all issues is mandated.

Reversed and remanded for a new trial consistent with the views expressed herein.

Reversed and remanded.

STAMOS, P. J., and PERLIN, J., concur.